```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION
```

| | | |
|---|---|---|
| David Ramsey, | : | Case No. 1:08-cv-134 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**ORDER**

Before the Court is the Magistrate Judge's Report and Recommendation (Doc. 12), and Plaintiff's Objections to the Report (Doc. 13). The Magistrate Judge recommends that this Court affirm the decision of the Administrative Law Judge denying Plaintiff's application for Social Security disability benefits.

**FACTUAL BACKGROUND**

Plaintiff David Ramsey was born in 1972 and has an eighth-grade education. His previous jobs include dishwasher and stock person, but more recently he worked for several years in a group home as a personal care aide. He began complaining of increasing sleep problems, and Ramsey's primary care physician, Dr. Smith, referred Ramsey for sleep evaluation in November 2002. At that time, he was complaining of significant difficulty staying awake, daily fatigue, memory deficits, and increasing inability to concentrate. (AR 205)

-1-

Dr. Wooten, a sleep specialist, diagnosed narcolepsy and possible sleep apnea, and began treatment with Provigil. (AR 211) The Merck Manual describes narcolepsy as "A rare syndrome of hypersomnia with sudden loss of muscle tone (cataplexy), sleep paralysis, and hypnagogic phenomena. ... [Its] symptoms may put the patient in danger, often interfere with work and social relationships, and can drastically reduce quality of life." The Merck Manual of Diagnosis and Therapy 1413-1414 (17th ed. 1999).

Ramsey continued to consult with Dr. Wooten over the next several months as Wooten was attempting to adjust his medications, and started him on Ritalin. Ramsey reported that drug helped his alertness but was not optimal. (AR 214) Ramsey was a "no show" for several appointments in July, August and September, and did not see Wooten again until January 13, 2004. At that time he complained about the side effects of Ritalin. Wooten discussed a trial with Xyrem (a fairly new treatment for narcolepsy), which Ramsey was willing to try but then reported he was unable to afford the high cost of that drug. (AR 218) Wooten wrote a letter to Ramsey's employer on October 19, 2004, explaining that effective treatment of narcolepsy requires a process of medication adjustment and that Ramsey was having trouble staying alert. Wooten stated that he should not drive or do any hazardous activity until his symptoms improved. (AR 221)

By December 3, 2004, Ramsey reported to Wooten that he was "barely making it." He had been fired his job and was applying for disability, he was still sleepy, and he felt depressed. He again requested a trial of Xyrem and a prescription for Ritalin. After that visit, Wooten's records reflect that Ramsey had no contact with Wooten from January 2005 until March 2006, with several "no show" entries during that time. His next visit was on March 23, 2006, when he told Wooten he needed more medication, had lost his insurance, and had not been regularly taking medication as a result. Wooten warned him that additional failures to keep appointments would result in terminating care. Wooten also noted that Ramsey's Epworth Sleepiness Scale score was 19, a "severe" score. (AR 330)[1]

Wooten completed a Residual Functional Capacity questionnaire in June 2005, in connection with the disability application, stating he had not seen Ramsey since 12/3/04 and did not know if he was taking his medications. He also stated that Ramsey had functional limitations resulting from narcolepsy, including avoiding power machines, moving machinery or other hazardous conditions; that he should avoid or limit driving; that

---

[1] This scale asks a patient to self-rate the likelihood of falling asleep during common sedentary daytime activities like sitting and reading, watching TV, lying down to rest in the afternoon, or sitting and talking to someone. The Scale is published on several websites, including http://www.stanford.edu/~dement/epworth.html, accessed on March 11, 2009.

he should avoid work which is not closely supervised; and that he may need breaks at unpredictable intervals during the workday. (AR 237) Wooten noted "serious limitations" in Ramsey's ability to maintain attention for two hour segments, perform at a consistent pace, and in using public transportation. (AR 238) After seeing Ramsey in March and April 2006, Wooten submitted a statement to the Hamilton County Job & Family Services Department on August 20, 2006, stating that Ramsey was not able to work, that he expected that inability to continue through Ramsey's life, and that he could not do a job requiring sustained attention or alertness. (AR 344)

Ramsey's health status was further complicated by a diagnosis of HIV in July 2006, although he appeared to be asymptomatic, and Ramsey has not challenged the ALJ's conclusion in that regard. He also has long-standing asthma and has complained of depression and anxiety, although he has not received psychiatric treatment for the latter conditions.

During the review of Ramsey's application for disability, he was examined by several consultants on behalf of the Commissioner. Dr. Ficke performed a psychological evaluation, and concluded that Ramsey had mild impairment of his ability to relate to others, given his sleep difficulties and emotional problems. Ficke concluded that his ability to understand, remember, and follow simple instructions was moderately impaired,

but observed he was able to follow her instructions during the evaluation. His ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was moderately impaired, particularly with concentration as he tended to work very slowly. Ramsey's ability to withstand stresses and pressures of daily work were mildly to moderately impaired, and additional stress would likely exacerbate his current symptoms. Dr. Ficke also observed that Ramsey would likely need a payee appointed to manage his funds if benefits were granted. (AR 240-245)[2]

Dr. Bailey, another consultant, performed a physical exam in January 2005. (AR 225-228) That examination was normal, and Bailey noted that Ramsey was alert and oriented and a good historian. He displayed no evidence of somnolence, and drove to his appointment. (AR 225-228)

Ramsey's application was initially denied, and he sought reconsideration. Dr. Waddell completed a mental residual functional capacity assessment in August 2005. (AR 254-270) Waddell did not examine Ramsey, but reviewed his records and gave great weight to Bailey's physical exam results, noting that Ramsey displayed no signs of somnolence. Waddell found no

---

[2] The ALJ refers to this report as authored by Paul Deardorff. While the letterhead on the opinion letter states "Paul A. Deardorff & Associates," it is signed by Susan Ficke, a clinical psychologist.

functional limitation in maintaining social functioning, mild limitation on daily living activities, and moderate limitations on concentration, persistence and pace. (AR 264) None of Ramsey's limitations were found to be "markedly limited" by Waddell (AR 268-269) or by Ficke. Waddell states that he gave considerable weight to Ficke's evaluation, and believed that Ramsey could adapt to a setting where duties are routine and predictable and quotas are not required, given his slow manner of functioning. (AR 270) Ramsey's request for reconsideration was denied.

    He then sought an ALJ hearing, which was held on May 17, 2007. (AR 360) The ALJ heard testimony from Ramsey about his symptoms and work history, and also from Robert Breslin, a vocational expert. Breslin opined that, based upon the job restrictions posed in the ALJ's hypothetical question, Ramsey could perform jobs including cashier II, small product assembler, assembler production, and subassembler. He also stated that Ramsey could perform some unskilled production inspection jobs, of which 2,300 were available locally. The ALJ then asked if Ramsey would be able to do any of those jobs if, due to his hypersomnolence, he would have to take as many as four unscheduled work breaks each day. Breslin thought that restriction would disqualify Ramsey from all those jobs. (AR 379-382)

The ALJ issued his decision on July 27, 2007, finding that Ramsey was not disabled. (AR 18-26) The ALJ concluded that Ramsey suffers from narcolepsy, asthma, depressive disorder, anxiety disorder, and mild obstructive sleep apnea, all of which are severe impairments. However, he found that none of these impairments met or equaled the applicable listings (section 3.00 for asthma, and section 12.00 for mental impairments). The ALJ's residual functional capacity found Ramsey able to perform less than the full range of light work. He should do only minimal sitting, no more than two hours a day and no more than 15 minutes each hour. He should not climb ladders, scaffolds, or ropes. He should not drive nor work on unprotected heights or around unguarded moving machinery. He should be limited to lifting, pushing or pulling 20 pounds occasionally or 10 pounds frequently, and should work in a clean environment. He has mild limitations on social functioning, and moderate limits in maintaining concentration, persistence, and pace. He should work in a stable, predictable work environment and should perform only routine, repetitive tasks. He should not be subject to strict, high time or production quotas. (AR 21)

The ALJ found that Ramsey's impairments would account for his reported symptoms, but that Ramsey's subjective descriptions of the frequency and severity of those symptoms were not entirely credible. He noted that Ramsey had not seen Dr. Wooten from

-7-

December 2004 to March 2006, yet testified that he had seen Wooten every two months for almost four years, and that Wooten had supplied him with Ritalin prescriptions for that entire period, a claim the ALJ rejected as "highly unlikely." Wooten's records include a notation that Ramsey had not picked up a prescription dated January 26, 2005. (AR 329) The ALJ concluded it was more likely that Ramsey went without Ritalin during that period. He noted Ramsey's high scores on the Epworth scale, but accounted for that by limiting him from sedentary jobs. The ALJ also cited Ramsey's testimony that he was able to work for several temporary agencies in 2005 and 2006, with assignments ranging from a day up to two weeks, jobs Ramsey described as light industrial type moving jobs. (AR 364) While this did not qualify as substantial gainful employment, it did support a conclusion that Ramsey was able to stay awake to perform the required tasks of that sort of job. Based upon the vocational expert's testimony that jobs meeting his RFC analysis were available, the ALJ concluded that Ramsey was not disabled and not entitled to benefits. After the Appeals Council denied review, Ramsey timely filed his complaint in this Court.

<u>The Magistrate Judge's Report and Recommendation</u>.

The Magistrate Judge found that the ALJ reasonably rejected Wooten's August 2006 statement that Ramsey was totally disabled, finding that it was not supported by the medical evidence. He

concluded that the ALJ did not err in his assessment of Ramsey's subjective complaints and credibility.  He also found the ALJ's hypothetical questions to the vocational expert accurately reflected the limitations included in the ALJ's RFC, rejecting Ramsey's argument that it left out the need to take frequent, unscheduled breaks during the work day.  The Magistrate Judge therefore recommended that the ALJ's decision be affirmed in all respects.

**DISCUSSION**

Standard of Review

Under 42 U.S.C. §405(g), this Court reviews the Commissioner's decision by determining whether the record as a whole contains substantial evidence to support that decision. "Substantial evidence means more than a mere scintilla of evidence, such as evidence a reasonable mind might accept as adequate to support a conclusion."  LeMaster v. Secretary of Health and Human Serv., 802 F.2d 839, 840 (6th Cir. 1986) (internal citation omitted).  The evidence must do more than create a suspicion of the existence of the fact to be established.  Rather, the evidence must be enough to withstand a motion for a directed verdict when the conclusion sought to be drawn from that evidence is one of fact for the jury.  Id.

If the ALJ's decision is supported by substantial evidence, the Court must affirm that decision even if it would have arrived

at a different conclusion based on the same evidence.  Elkins v. Secretary of Health and Human Serv., 658 F.2d 437, 438 (6th Cir. 1981).  The substantial-evidence standard "... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)).

The district court reviews de novo the Magistrate Judge's recommendations regarding Social Security benefits claims.  Ivy v. Secretary of Health & Human Serv., 976 F.2d 288, 289-90 (6th Cir. 1992).

Ramsey's Objections

Ramsey's objections to the Report and Recommendation are each addressed below.

1. The ALJ Failed to Consider the Episodic Nature of Narcolepsy.

Ramsey contends that the ALJ's reliance upon the exams by the Commissioner's consultants, Drs. Bailey and Ficke, fail to properly account for the episodic nature of narcolepsy.  He notes that the malady does not prevent him from having periods of alertness and lack of sleepiness, which both Bailey and Ficke noted on the days that they examined Ramsey.  The ALJ gave great weight to these observations, which Ramsey contends is erroneous.

Narcolepsy is considered a mental disorder, and the SSA regulations on evaluating mental impairments require consideration of all relevant evidence, in order to obtain a longitudinal picture of the overall degree of functional limitation. 20 C.F.R. §404.1520a(c)(1). Four functional areas must be analyzed: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3). Listing 12.00 on mental disorders also states that when such impairments may vary a claimant's level of functioning over time, it is important to obtain longitudinal evidence of variations in functioning that may be caused by such episodic impairments, in order to properly establish the severity of the impairment. 20 C.F.R. Part 404, Appendix 1, Listing 12.00(D)(2).

The ALJ gave great weight to Dr. Bailey's physical assessment in January 2005, when Ramsey appeared with no evidence of somnolence and was alert. But this appointment was shortly after Ramsey saw Wooten in December 2004, when he apparently was on a steady dose of Ritalin. Wooten had also described Ramsey during that visit as "alert" and oriented x3 but also "sleepy," noting that Ritalin only partially controlled his symptoms. (AR 326) Reliance on Dr. Bailey's assessment alone would contravene the requirement of a longitudinal assessment of a claimant's symptoms.

But the ALJ did not rely solely on Bailey. Ficke evaluated Ramsey in July 2005, about six months later. He reported then that he did not drive himself to the appointment and was seeing a sleep specialist. He denied falling asleep doing activities such as driving, and failed to endorse symptoms of sleep attacks. Later, after initially denying problems driving, he told Ficke that Ritalin and having a passenger with him helped him remain alert. He also told Ficke that he sometimes took more Ritalin than had been prescribed, presumably to help with alertness. (AR 243)

In considering all of the evidence, the ALJ noted that Waddell's record assessment was consistent with Ficke's and with Ramsey's own statement to Wooten, that the Ritalin helped him. In the Court's view, the ALJ did not ignore the episodic nature of narcolepsy; rather, the ALJ found that the record over time (from November 2002 through December 2006) supports a conclusion that Ramsey's symptoms improved with proper medication management. The Court finds no error in that conclusion.

2. <u>The ALJ Failed to Properly Consider Dr. Wooten's Opinion and to Explain Why He Rejected That Opinion</u>.

Ramsey contends that the ALJ improperly rejected Wooten's August 2006 opinion, and ignored some of the restrictions listed in Wooten's June 2005 RFC assessment. He also argues the ALJ failed to properly explain why he rejected the conclusion of Ramsey's treating physician and gave more weight to the non-

treating consultants.

A Social Security regulation states that a treating physician's opinion is entitled to controlling weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §404.1527(d)(2). That regulation also prescribes a number of factors to consider in this regard, including length and frequency of visits during the treatment relationship, specialization, and consistency with the entire record. In that regard, 20 C.F.R. §416.927(d)(4) instructs that "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." The ALJ may therefore reject a treating physician's opinion if it lacks support or is inconsistent with the evidence of record. Moreover, the ALJ need not accept a medical opinion that a claimant is "disabled," as that determination rests with the Commissioner pursuant to 20 C.F.R. §404.1527(e)(1).

The ALJ rejected Wooten's August 10, 2006 statement to Hamilton County that Ramsey was totally disabled and could not do a job requiring sustained attention, finding it inconsistent with Wooten's own records. Ramsey resumed taking Ritalin in March of that year, and the next month reported that it helped with alertness. He also told Wooten that he was having difficulty

-13-

getting a job, but was working for a temporary agency. (AR 331) Ramsey failed to keep his July 17, 2006 appointment, and did not see Wooten again until September 11, when he needed more Ritalin. (AR 333) The ALJ was entitled to reject Wooten's August 2006 evaluation, given the long gap in Wooten's actual treatment of Ramsey, and the fact that it was not consistent with his notes of the April visit.

The ALJ did give "great weight" to Wooten's June 2005 evaluation, despite the fact that Wooten had not seen Ramsey for six months prior to that evaluation. Given that fact, Wooten also indicated that Ramsey's limitations at that time were not completely disabling. Wooten also stated that Ramsey would have "good and bad" days, but did not state that his "bad" days would necessarily result in regular work absences. (AR 238) The ALJ found that Wooten's subsequent treatment records and evidence of improvement with medication contradicted Wooten's conclusory statement that Ramsey was totally disabled. The ALJ also noted that Wooten's concern with Ramsey's inability to maintain attention for two or more hours was largely addressed by eliminating sedentary work from the RFC. The Court sees no error in this analysis.

3. <u>The ALJ Improperly Evaluated Ramsey's Subjective Complaints</u>.

Ramsey contends that the ALJ erred in discounting his subjective descriptions and questioned his credibility because he

missed appointments with Dr. Wooten.

It is proper for the ALJ to consider a claimant's credibility, and to evaluate his subjective complaints (in this case of sleepiness) against the objective medical data. 20 C.F.R. §416.929(a) sets out the test for that evaluation. Once a medical condition is found to exist (which is not disputed here), the ALJ must consider (1) whether objective medical evidence confirms the severity of the reported symptoms, or (2) whether the condition can reasonably be expected to produce the alleged disabling symptoms. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ's assessment, if properly explained and supported, is entitled to deference from this Court.

The ALJ rejected Ramsey's claim that Wooten gave him enough prescriptions for Ritalin to last from December 2004 through March 2006, finding it "highly unlikely" that Wooten would have done that. Wooten's records also contain a notation that Ramsey failed to pick up at least one Ritalin prescription. The Court notes that Ritalin, methylphenidate, is a Schedule III controlled substance pursuant to 21 U.S.C. §812. This fact lends support to the ALJ's conclusion. Ramsey's testimony also conflicts with what he told Wooten in March 2006, that he had not been regularly

-15-

taking his medication.

Ramsey also contends that the ALJ relied too heavily upon the record of his missed appointments. He contends that the ALJ erred in failing to consider the fact that he lost his job and his health insurance, creating financial difficulties in obtaining care. Citing McKnight v. Secretary, 927 F.2d 241 (6th Cir. 1990), he argues the ALJ must consider whether a claimant is unable to obtain necessary remedial treatment.

The record reflects that Ramsey told Wooten several times that he could not afford the cost of Xyrem. Ramsey testified at the ALJ hearing that he had not seen Wooten since December 2006 due to a lack of funds, but also that he had seen Wooten almost every two months from 2002 through 2006. (AR 368) He stated that he "might have stopped going to him because I had lost my insurance," but that he learned that "some foundation or something" would pay for a while. (AR 369) Ramsey did not testify that he could not afford Ritalin, nor that the many "no-show" appointments noted in Wooten's records were due to a lack of funds.

McKnight held that a proper sequential analysis requires the Secretary to determine if a claimant's impairments are disabling without regard to treatment. If so, the Secretary must determine if affordable, available treatment would prevent that disability from being a severe impairment. The Sixth Circuit reversed an

ALJ's finding that the claimant did not have a "severe impairment" because his condition could be remedied by surgery, because the ALJ ignored the claimant's unrebutted testimony that he had no means to pay for that surgery. McKnight, 927 F.2d at 242. That is not what occurred here. The ALJ found that Ramsey had a severe impairment, but also found that treatment that was available to him - Ritalin - remedied that condition sufficiently that it did not constitute a severe, disabling impairment.

Finally, the ALJ did not find Ramsey to be entirely lacking in credibility. He credited the evidence in the record that Ramsey would be sleepy at times due to his impairment. But he concluded that Ramsey's statements on the limiting effects of that impairment were not "entirely credible" due to the discrepancies he noted in the medical records. This is entirely consistent with Walters, and the Court rejects Ramsey's objections.

4. The ALJ Failed to Account for Ramsey's Need for Unscheduled Breaks During the Work Day.

Ramsey contends the ALJ erred in posing his hypothetical question to the vocational expert, because it did not include the limitations of needing at least four unscheduled breaks a day, and the inability to maintain attention for at least two hours at a time.

The ALJ posed two questions to the expert. The first did not include these limitations. (AR 379) The expert responded

that jobs within the listed restrictions were available. The ALJ then added the limitation of as many as four breaks per day. That added limitation disqualified Ramsey from the jobs the vocational expert described in response to the first question. (AR 381) This hypothetical limitation apparently stemmed from Wooten's June 2005 RFC assessment, which included his observation that Ramsey "may need breaks at unpredictable intervals during workday due to spells, adverse effects of medications, etc." (AR 237)

As noted above, the ALJ's RFC did not include this limitation. The ALJ found that Ramsey's sleepiness occurred during sedentary activity, and he accounted for this by limiting Ramsey's sitting to no more than two hours a day and no more than 15 minutes each hour. (AR 21) Wooten's observations of Ramsey's sleepiness are premised on Ramsey's self-reported Epworth Scale results. In addition to the subjective nature of the Epworth scores, the ALJ specifically restricted Ramsey from doing sedentary work which he found would adequately address those limitations.

The Court has carefully reviewed the record regarding Ramsey's reported symptoms and his alleged limitations. While this Court may have decided the issue differently, the Court finds substantial evidence in the record that supports the ALJ's RFC assessment. Therefore, the ALJ did not err in posing the

hypothetical question to the vocational expert, and could properly rely on that opinion in finding that Ramsey was not disabled from all available employment.

## CONCLUSION

For all of the foregoing reasons, the Court overrules Plaintiff's Objections to the Magistrate Judge's Report and Recommendation, and adopts the recommendations contained in the Report. This Court affirms the decision of the Administrative Law Judge denying Plaintiff's application for disability benefits.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: March 17, 2009              s/Sandra S. Beckwith
                                    Sandra S. Beckwith
                                    Senior United States District Judge